UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WILBERT WILKINS,<br><br>      Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of Social Security,[1]<br><br>      Defendant. | No. 12 C 0078<br><br>Magistrate Judge Mary M. Rowland |

# MEMORANDUM OPINION AND ORDER

Plaintiff Wilbert Wilkins filed this action seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income Benefits under the Social Security Act ("SSA"). 42 U.S.C. §§ 416(i), 423, 1614(a)(3)(A) and 1381a. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and Plaintiff has filed a Motion for Summary Judgment. For the reasons stated below, Plaintiff's motion is denied.

## I. THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To recover Supplemental Security Income Benefits ("SSI"), a claimant must establish that he or she is disabled within the meaning of the SSA.[2] *York v. Mas-*

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security and is substituted for her predecessor, Michael J. Astrue, as the proper defendant in this action. Fed. R. Civ. P. 26(d)(1).

[2] The regulations governing the determination of disability for SSI are found at 20 C.F.R. § 416.901 *et seq.*

1

*sanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

## II. PROCEDURAL HISTORY

Plaintiff applied for SSI on August 25, 2008, alleging he became disabled on August 1, 2004, due to diabetes mellitus, obesity, and obstructive sleep apnea. (R. at 167, 172). The application was denied initially and again on reconsideration. (*Id.* at

85, 90–91). Plaintiff filed a timely request for a hearing. (*Id.* at 93). The Administrative Law Judge ("ALJ") conducted a hearing on November 18, 2010, that consisted of testimony from Plaintiff as well as a Vocational Expert ("VE"), Edward Pagella. (*Id.* at 28–78). On January 12, 2011, the ALJ denied benefits. (*Id.* at 10–21). On March 3, 2011, Plaintiff filed a request for review with the Appeals Council. (*Id.* at 252–56). The Appeals Council upheld the denial of Wilkins's claim on November 9, 2011. (*Id.* at 1–3). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity from his application date of August 25, 2008. (R. at 12). At step two, the ALJ found that Plaintiff has the severe impairments of diabetes mellitus ("DM"), obesity, and obstructive sleep apnea ("OSA"). (*Id.*). At step three, the ALJ determined that Plaintiff's impairments do not meet or medically equal the severity of any of the listings enumerated in the regulations. (*Id.* at 13–14). The ALJ then assessed Plaintiff's residual functional capacity ("RFC")[3] and determined that Plaintiff has the RFC to perform "sedentary work as defined in 20 CFR 416.967(a)." (*Id.* at 14). Consistent with sedentary work, the ALJ found that Plaintiff can lift up to 10 pounds occasionally, stand and/or walk up to 2 hours in an 8-hour workday and can sit throughout the workday. (*Id.*). Further, the ALJ found that "[t]he record does not establish a medical need for claimant

---

[3] "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008).

3

to elevate his legs while seated. Claimant would be distracted only rarely by symptoms or fatigue to the extent that he was off task and not productive outside break time." (*Id.*). Based upon Plaintiff's "extreme obesity and complaints of fatigue," the ALJ limited claimant's work options in the following ways: ladders, scaffolds and exposure to respiratory irritants are off limits; no kneeling, crouching, or crawling; and only occasional stooping or climbing of ramps or stairs. (*Id.*). The ALJ determined at step four that Plaintiff has no past relevant work history. (*Id.* at 19) (citing 20 C.F.R. § 416.965). At step five, based on Plaintiff's RFC and the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including telephone quotations clerk, hand inspector, and bench packer. (*Id.* at 20). Accordingly, the ALJ concluded that Plaintiff has not been under a disability, as defined by the Social Security Act, since the date of his application. (*Id.*).

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a

4

reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

### IV. RELEVANT MEDICAL & VOCATIONAL EVIDENCE

Mr. Wilkins, who was 39 years old on the date of his hearing, lives on the first floor of a two flat building with his grandmother. (R. at 33). He has no source of income, although he does receive food stamp assistance. (*Id.*). A high school graduate, Wilkins has received vocational training certificates in food service and landscaping. (*Id.* at 34). He testified that he applied for disability benefits in August 2008 because he learned that "[he] had sleep apnea . . . besides the diabetes." (*Id.* at

5

39). He described the reason he cannot work is "the way I fall asleep through the day. . . . I fall asleep maybe three or four times a day." (*Id.* at 49; *see also id.* at 172).

Mr. Wilkins takes daily insulin for his diabetes and takes Lasix for the leg swelling which is a result of his diabetes. (R. at 57–58). The Lasix is helpful and means that his leg is "not as bad as . . . where . . . you can punch it and feel the water." (*Id.* at 58). His daily routine involves making breakfast, taking his daily insulin, and watching television. He helps his grandmother by sweeping, making his bed, cooking dinner, doing laundry and shopping for groceries. (*Id.* at 65–67). He visits with his children three times a week and attends his son's basketball game for about one quarter. (*Id.* at 67–68). He tries to walk about four blocks three times a week for exercise. (*Id.* at 54). He can stand for about 15 minutes and can lift 25 pounds. (*Id.* at 69). He can sit in one position for about 15–20 minutes; he then changes position because of ankle and leg swelling. (*Id.* at 70). He testified that when his legs or feet swell, he elevates his feet for 25–30 minutes, until the swelling goes down; he also elevates his feet twice a day for about 45 minutes to address swelling generally. (*Id.* at 71).

He wakes up every hour during the night to use the washroom or because he feels like he is choking due to the sleep apnea. (R. at 73). He testified that he falls asleep three to four times a day, for up to two to three hours. The shortest nap he takes lasts from 30–45 minutes. Even on his best day, he still falls asleep during the day. (*Id.* at 75). According to his testimony, three out of every seven days are bad

days when he has "constant pain in my knees and ankles from swelling" and he is "real tired [and] . . . just . . . can't do anything." (*Id.*).

The medical records are straightforward. Wilkins was successfully treated with Lasix at Stroger Hospital in June 2006 for swelling of the legs. (R. at 279–82). He weighed 357 pounds at the time. (*Id.*). Results from an echocardiogram administered in August 2006 were essentially unremarkable. (*Id.* at 261–61). While being treated for the swelling, Wilkins indicated that he took six naps per day. (*Id.* at 277). He was referred to the sleep clinic for a sleep apnea consult. (*Id.*).

According to an overnight polysomnogram ("PSG") administered by Stroger Hospital on September 7, 2007, Wilkins suffers from obstructive sleep apnea ("OSA"). (R. at 258). According to the PSG results, Wilkins's "obstructive events were virtually eliminated with the use of nasal CPAP at a pressure of 14 cm." (*Id.* at 259). The report concluded that "this patient's sleep disorder breathing was effectively treated" with nasal CPAP titration. (*Id.* at 260). During the sleep study, Wilkins used a small "Respironics Comfort Classic mask and heated humidification, with a C-Flex setting of 3." (*Id.*). The report indicates that since Plaintiff was not successful with the full face mask, he should be prescribed the Comfort Classic with a chin strap. (*Id.*).

He was fitted with his own CPAP and instructed on how to use it on October 1, 2007. (R. at 291). At that time the records indicate that Wilkins "tolerated CPAP well." (*Id.*). At a follow-up visit on November 19, 2007, Wilkins complained of discomfort with the CPAP and poor sleep. (*Id.* at 290). The electronic "compliance data"

7

from the CPAP for the preceding 50 days showed that Wilkins had used the CPAP on 18 of the 50 days. (*Id.*). On the days he used the CPAP, he used it for an average of 1 hour and 9 minutes; averaged over all 50 days, Wilkins had used the CPAP only 25 minutes per day. (*Id.*). It was recommended that he use the CPAP regularly and exercise daily. (*Id.*).

In January 2008, Wilkins reported improvement with his OSA due to the CPAP. (R. at 289). The records indicate a discussion about a referral for a tonsillectomy, but also note that such a procedure would require weight loss. (*Id.*). By May 2008, he reported that he had stopped using the CPAP due to discomfort, and that he was interested in the surgery. (*Id.* at 288). He indicated he had joined the YMCA. (*Id.*). In July, he reported that he used the CPAP intermittently and that it "works when he uses it." (*Id.* at 287). In October 2008, he discussed having a uvulopalatopharyngoplasty ("UPPP") to enlarge his breathing airway "not for curative intent but to [decrease] CPAP settings to aid in tolerance." (*Id.* at 257). However, according to the records, due to his obesity, there were risks associated with that procedure. (*Id.*). According to Wilkins's testimony, he never lost enough weight to follow-up on having the procedure. (*Id.* at 56).

Wilkins testified that he can put the CPAP mask on and read with it, but he cannot sleep with it because "it goes over the nose . . . [and] when [he's] falling asleep [his] mouth comes open" and it makes him gag. (R. at 49–50). He attempted to get a replacement mask from Stroger Hospital but was unsuccessful; therefore, he has tried to find a "new sleep study place" that will accept his medical card for

8

payment. (*Id.* at 50). According to his testimony, his last appointment at the sleep clinic was in July 2008. (*Id.* at 51). He forgot his medical card at his follow-up visit and was required to reschedule. He apparently attempted to call the sleep clinic to reschedule his appointment, but he never heard back from them. (*Id.* at 52). He also called the "place where the machine came from to try to get a new mask and they told" him to contact Stroger Hospital. (*Id.*). Finally, his grandmother found a different clinic that had a sleep study, and he "is waiting on them to see if they will accept the Medicaid card." (*Id.*). He testified that he told his current treating doctors, Dr. Blair from West Suburban Hospital and staff at the Austin Family Health Clinic, "about the complications" with the CPAP, but neither of them have referred him to any place for assistance. (*Id.* at 52–53). During examination by his counsel, Mr. Wilkins testified that he continues to wear the CPAP mask during the day and attempts to wear it at night until it chokes him and scares him awake. (*Id.* at 73).

Between May 2008 and March 2009, Wilkins sought treatment for his diabetes at West Suburban Medical Center. (R. at 293–95, 336–42). During his eight visits to West Suburban, the records indicate that his diabetes is essentially controlled by medication. In addition to routine checks of his diabetes, in January 2009, he complained of back pain. (*Id.* at 337).

In April 2009, he began treatment at PCC Community Wellness/Austin Family Health Center, primarily for his diabetes. (R. at 348–64). He had appointments at PCC in April, May, July (twice), and November 2009, and in February and May 2010. (*Id.*) All of these records reflect routine monitoring of Wilkin's diabetes and

9

encouraging weight loss. None of those records reflect any discussion of Wilkins's OSA or the discomfort of his CPAP. He never complains of fatigue or uncontrolled sleep. The first mention of the apnea was at an appointment on August 18, 2010, (*id.* at 343–47), at which time his sleep apnea was assessed as "unchanged." In the general review of symptoms that day, Wilkins "denies fatigue." (*Id.* at 344). Wilkins reported that he was "attempting to use CPAP" and stated "he will go to a different sleep center and ask to change his face mask to improve comfort." (*Id.* at 346). That is the last medical record submitted prior to the hearing on November 18, 2010.

On November 11, 2008, Dr. Marion Panepinto completed a Physical Residual Functional Capacity Assessment. (R. at 296–303). Dr. Panepinto concluded that, with some limitations, Wilkins is capable of performing light work. (*Id.*). On February 11, 2009, Dr. George Andrews completed a follow-up Physical Residual Functional Capacity Assessment and determined that Wilkins could perform sedentary work, with the same restrictions recommended by Dr. Panepinto. (*Id.* at 318–25). In January 2009, Wilkins was evaluated by Dr. Barry Fischer on behalf of the Bureau of Disability Determination Services. (*Id.* at 304–08). Dr. Fischer diagnosed morbid obesity, insulin dependent diabetes mellitus, sleep apnea, right heart failure, and limited range of motion in Wilkins's knees due to obesity. (*Id.* at 308).

Mr. Edward Pagella, a vocational rehabilitation consultant, testified that Plaintiff has no relevant past work. (R. at 42). He then testified that there "would be a wide variety of unskilled, light occupations within the local and national economy" for a person of Plaintiff's age and educational background who have "the residual

functional capacity to perform the full range of light exertional level, except that he would never climb ladders, ropes or scaffolds." (*Id.* at 42–43). If the individual were further limited by not being able to work on moving or unstable surfaces, only occasionally climb ramps or stairs, never kneel, crouch or crawl and only occasionally stoop and never work around respiratory irritants, there would be jobs in the economy including telephone quotation clerk, hand inspector and bench packer. (*Id.* at 43–44). That person is allowed three breaks throughout the day and needs to be "working at a constant basis, as defined as 84 percent of the workday." (*Id.* at 44). The VE admitted that if the worker was "distracted frequently . . . [and] was off task and unproductive: he would be terminated." (*Id.* at 45). On cross-examination, the VE testified that if the person has to elevate their legs above chest level, there would be no jobs for that person; however, if the person required elevating their legs on a stool "that would be an accommodation." (*Id.* at 46). He then added that he does job placement and "that has come up, where we do have to ask [employers for a stool] and . . . that's not an issue." (*Id.*). But because employers could refuse the accommodation, it is impossible to quantify the number of jobs available given that accommodation. (*Id.* at 47). The VE also admitted that if the worker falls asleep unpredictably at least half an hour a day, that person would not be able to sustain employment. (*Id.* at 47–48).

## V. DISCUSSION

In support of his request for reversal or remand, Plaintiff argues that the ALJ erred: (1) by finding that Plaintiff was non-compliant with the CPAP; (2) by failing

11

to obtain an expert opinion as to Plaintiff's exertional and non-exertional impairments; and (3) by disregarding the VE's testimony that an employee who falls asleep during the work day will be terminated.

**A. The ALJ's finding that Wilkins is not compliant with his CPAP was a factor in the ALJ's credibility determination.**

The primary basis of Wilkins's claim for SSI benefits is his sleep apnea, which, according to his testimony, leads to his falling asleep unpredictably and regularly during the day. (R. at 17) ("[Plaintiff] testified that it would be hard for him to work because he falls asleep unpredictably throughout the day."). It is uncontested that Wilkins suffers from Obstructive Sleep Apnea (OSA).[4] The ALJ found Wilkins's "testimony about his fatigue and reduced stamina and mobility partially credible, as his extreme obesity likely contributed to those complaints." (*Id.* at 18). However, in finding Wilkins only partially credible about the severity of his daytime sleep, the ALJ noted that:

> even though the objective evidence shows that [Plaintiff's] sleep apnea was markedly improved with the CPAP equipment, he has failed, for reasons he has not explained, to use the provided equipment or to secure more comfortable alternative. I also note that, although [Plaintiff] testified to severe daytime sleepiness with frequent naps throughout the day, he has not complained frequently or consistently to treating physicians of this problem since 2008, until shortly before this hearing.

(*Id.*).

---

[4] OSA is defined as "a potentially serious sleep disorder in which breathing repeatedly stops and starts" because the "throat muscles relax." <www.mayoclinic.com/health/sleep-apnea> A common symptom of OSA is excessive daytime sleepiness, also known at hypersomnia, which is the result of the repeated interrupted sleep throughout the night. *Id.*

12

Plaintiff argues the ALJ (1) violated Social Security Ruling ("SSR")[5] 82-59 by failing to document whether free community resources were available to provide a more comfortable CPAP; and (2) erred in determining that compliance with his CPAP prescription would restore Wilkins's ability to engage in substantial gainful employment. (Mot. 9–10). The Court disagrees.

In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p. An ALJ may not discredit a claimant's testimony about her symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). If a claimant's symptoms are not supported by medical evidence, the ALJ may not ignore available evidence. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 540 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements

---

[5] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p. The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

The ALJ conducted a thorough review of the medical and testimonial evidence before determining that Wilkins has the RFC to perform sedentary work, with restrictions. In rendering this opinion, the ALJ made a credibility determination wherein she credited Wilkins's testimony about fatigue and reduced stamina. (R. at 18). However, she then discredited his testimony regarding the *severity of the fatigue* because (1) he failed to take any steps to secure a more comfortable mask; and (2) despite numerous medical appointments in 2009 and 2010, he did not complain of severe fatigue between 2008 and his August 2010 appointment, just three months before the hearing. (*Id.*) There is no error in this credibility determination by the ALJ. The medical records are unequivocal that Wilkins never complained to his treating physicians about severe daytime fatigue. As the Commissioner points out, Wilkins does not dispute this fact in his brief. (Resp. 5). In fact, even at his August 18, 2010 appointment (R. at 343–47), at which Plaintiff discussed his discomfort with his CPAP mask, he "denie[d] fatigue." (*Id.* at 344). It was a proper exercise of the ALJ's discretion to discount the severity of Wilkins's claimed fatigue on this ba-

14

sis alone. *Simila v. Astrue,* 573 F.3d 503, 517 (7th Cir. 2009) ("Though the ALJ's credibility determination was not flawless, it was far from 'patently wrong.' The ALJ had plenty of reason to doubt Simila's description of his symptoms and the extent of the constraints they impose.").

Contrary to Plaintiff's assertion, SSR 82-59—which requires the SSA to make certain findings if an "[i]ndividual[] with a *disabling impairment*" (emphasis in original) is going to be denied benefits because of his refusal to follow prescribed treatment—is not applicable here. Prior to denying benefits to a person with a disabling impairment that is amenable to treatment because the person is not following the prescribed treatment, SSR 82-59 requires the ALJ to make findings regarding the reason the claimant is not following the prescribed treatment. If the claimant testifies that it is a matter of cost, the ALJ then must make findings regarding the claimant's financial circumstances as well as his efforts to obtain free community resources. What Wilkins ignores in his argument is that the ALJ determined that he does not have a disabling impairment, and he is not being denied the benefits because of his failure to wear the CPAP. Rather, the ALJ determined, based on a review of the entire record, that Wilkins's testimony about the severity of his fatigue was not entirely credible in light of (1) his failure to discuss the problem at his many medical appointments; (2) his admitted failure to wear the mask, which he admitted helped him; and (3) his lack of effort to obtain a more comfortable mask. This was a decision squarely within the ALJ's discretion.

For the same reason, Plaintiff's argument that the ALJ erred in determining that compliance with his CPAP prescription would restore Wilkins's ability to engage in substantial gainful employment misses the mark. The ALJ found that Wilkins could engage in substantial gainful employment. There was no need to find that his use of the CPAP would *restore* his ability to work. Moreover, it is undeniable that to the extent that Plaintiff's sleep apnea contributed to his fatigue, it was essentially cured by the use of the CPAP. According to the PSG results, Wilkins's "obstructive events were virtually eliminated with the use of nasal CPAP at a pressure of 14 cm." (R. at 259). The report concluded that "this patient's sleep disorder breathing was effectively treated" with nasal CPAP titration. (*Id.* at 260). Wilkins himself reported to his doctor in July 2008, that the CPAP "works when he uses it." (*Id.* at 287). In light of the uncontradicted medical evidence, the ALJ was well within her discretion to determine that Wilkins was not entirely credible when he testified that he was unable to work because of his unexpected daytime sleep.

**B. ALJ's failure to have an expert testify as to Plaintiff's exertional and non-exertional limits was not error.**

Plaintiff contends that because there was no medical expert *at the hearing*, the "record lacks an expert opinion on whether Wilkins would be able to perform substantial gainful activity with perfect CPAP use, whether intolerance of CPAP is common, or whether alternative CPAP masks are readily available to persons with Public Aid medical card." (Mot. 10). Plaintiff also asserts that the ALJ's determination "that Mr. Wilkins did not need to elevate his legs during the day" was improper. (*Id.* 12).

16

Plaintiff cites no case law or regulation requiring testimony from a medical expert. An ALJ must "summon a medical expert if that is necessary to provide an informed basis for determining whether the claimant is disabled." *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000); *see also* 20 C.F.R. § 404.1527(e)(2)(iii). But "[a]n ALJ is not required to call a medical expert simply because a claimant has failed to meet his burden of demonstrating that he suffers from an impairment listed in the SSA." *Riley v. Astrue*, No. 11 C 3771, 2012 WL 1655970, at *3 n.2 (N.D. Ill. May 10, 2012); *see Canata v. Astrue*, No. 09 C 5649, 2011 WL 6780923, at *8 (N.D. Ill. Dec. 23, 2011) (decision to call an ME is left to ALJ's discretion). It is axiomatic that an ALJ may not substitute his own judgment for a physician's opinion without relying on other medical evidence in the record. *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007). "An ALJ, however, is not only allowed to, but indeed must, weigh the evidence and make appropriate inferences from the record." *Mitchell v. Colvin*, No. 10 C 7464, 2013 WL 3729722, at *9 (N.D. Ill. July 11, 2013).

In this case, Plaintiff presents no opinion from any treating physician (and there is no indication in any record reviewed by this Court) that Plaintiff's ability to work is limited, let alone foreclosed, by any of his medical conditions. The only medical personnel to opine on Wilkins's ability to work are the SSA consultants, the first of whom found that he could perform light work, the second of whom found he could perform sedentary work, with the limitations contained in the ALJ's RFC. (R. at 296–303, 318–25). In her well-reasoned and thorough opinion, the ALJ reviewed all the medical records—none of which indicated an opinion that Wilkins was unable to

work or unable to perform any tasks—and the opinions proffered by the two consulting doctors. This record provided an adequate basis for the ALJ's conclusion that Plaintiff was able to engage in substantial gainful employment. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (finding that where "the evidence was adequate for the ALJ to find [the claimant] not disabled, . . . the ALJ acted within his discretion in deciding not to call a medical expert").

The plaintiff relies on cases that caution ALJs not to "succumb to the temptation to play doctor." (Mot. 11). But both of these cases present situations where a treating doctor opined that a person was disabled and a consulting doctor disagreed. *See Schmidt v. Sullivan,* 914 F. 2d 117, 119 (7th Cir. 1990) (error for an ALJ to determine plaintiff can return to previous employment where his treating physician indicates, and there is no contrary evidence, that he cannot return to previous employment); *Rohan v. Chater,* 98 F.3d 966, 969–70 (7th Cir. 1996) (reversing because the ALJ "independently evaluated the evidence in this case and improperly substituted his judgment for that of [treating psychiatrist]") The ALJ here did not substitute her judgment for any medical opinion. She reviewed and considered the records, all of which are consistent with the medical opinion that Wilkins is capable of light/sedentary work. There is nothing in Wilkins's treating medical records that contradict this finding.

## C. ALJ's determination is supported by substantial evidence.

Finally, plaintiff contends that her decision is not supported by substantial evidence because the VE testified that (1) plaintiff would be terminated if he fell

18

asleep; (2) there are no jobs available for a person who needs to raise his legs above waist level; and (3) he was unable to quantify the number of jobs for a person who would need an accommodation in the form of a stool to elevate his legs below waist level.

As discussed above, the ALJ properly discounted Wilkins's testimony about frequent sleeping during the day. Since the ALJ did not err in making this credibility determination, it was not error for the ALJ to discount the VE's testimony that a person who falls asleep on the job would be terminated.

In determining the RFC, the ALJ found that the "record does not establish a medical need for claimant to elevate his legs." (R. 14). Given that finding, there would be no reason for the ALJ to address the VE's testimony regarding an employee who needs to elevate his legs, whether above or below the waist. There is *no* evidence in the record that Wilkins needs to elevate his legs above waist level. Wilkins testified that when his legs or feet swell, "there's a little stool [I] pull up and I just prop them up." (*Id.* at 72). More importantly, there is no indication in *any* medical record that he should elevate his legs or that swelling was a significant problem for him. Consistent with his testimony, the medical records all indicate that he responds well to Lasix. The ALJ's RFC determination was supported by substantial evidence and she did not commit error by not considering the VE's testimony about the impact of leg elevation on job opportunities.

Consistent with sedentary work, the ALJ found that Plaintiff can lift up to 10 pounds occasionally, stand and/or walk up to 2 hours a workday and can sit

throughout the workday. (R. at 14). Plaintiff himself testified that he can stand for about 15 minutes and can lift 25 pounds. (*Id.* at 69). He can also sit in one position for about 15–20 minutes and then changes position because of ankle and leg swelling. (*Id.* at 70). After carefully examining the record, the Court finds that the ALJ's determination of Plaintiff's RFC was fully grounded in the medical and testimonial evidence.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [16] is **DENIED.** Pursuant to sentence four of 42 U.S.C. § 405(g), the Commission's decision is affirmed.

E N T E R:

Dated: October 7, 2013

MARY M. ROWLAND
United States Magistrate Judge